IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 19, 2012 Session

**STATE OF TENNESSEE v. GLENN LYDELL McCRAY**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2362    Monte Watkins, Judge**

**No. M2011-02411-CCA-R3-CD - Filed May 2, 2013**

The Defendant, Glenn Lydell McCray, was found guilty by a Davidson County Criminal Court jury of especially aggravated kidnapping, a Class A felony, two counts of aggravated assault, Class C felonies, and being a felon in possession of a firearm, a Class E felony. *See* T.C.A. §§ 39-13-305 (2010) (especially aggravated kidnapping), 39-13-102 (2010) (aggravated assault), 39-17-1307 (2010) (felon in possession of a firearm). He was sentenced as a Range II, multiple offender to thirty years for especially aggravated kidnapping, eight years for each aggravated assault, and three years for illegal possession of a firearm. The trial court ordered consecutive sentences for the especially aggravated kidnapping and aggravated assault convictions, for an effective forty-six-year sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support the especially aggravated kidnapping conviction, (2) the court improperly instructed the jury regarding the especially aggravated kidnapping conviction, (3) the court erred by failing to merge the aggravated assault convictions, and (4) the court erred by imposing consecutive sentencing. Although the jury was not properly instructed regarding the especially aggravated kidnapping conviction, we conclude that the error was harmless beyond a reasonable doubt and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, JJ., joined. THOMAS T. WOODALL, J., filed a separate opinion concurring in part and dissenting in part.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher (on appeal), Kristin Neff (at trial), and Joseph Michael Engle (at trial), Assistant Public Defenders, for the appellant, Glenn Lydell McCray.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Hugh T. Ammerman, III, and Michelle Delgato, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Metro Police Officer William Caillouette testified that on June 16, 2010, he responded to a domestic disturbance at 6535 Premier Drive, apartment K-10 in Davidson County and that when he arrived at the scene, he saw the victim and two children, who were upset and running down the steps. He said the victim had visible signs of "being in an altercation." He stated that the victim ran to another officer and that he walked to the apartment. He said he saw the Defendant, who denied doing anything to the victim. He said that the Defendant was sweaty and nervous and that he saw a rifle on the sofa in the living room. The Defendant was placed in a patrol car.

Officer Caillouette testified that he saw bruises on the victim's face, cuts to her lip and forehead, a knot on her head, and a large human bite mark on her leg. He said he spoke with the victim while she was inside the ambulance. He denied looking for a baseball bat at the scene and said a bat was not found. He said another officer found a butcher knife. He identified the rifle and knife. On cross-examination, Officer Caillouette stated that the rifle found at the scene was unloaded and that he did not find any ammunition inside the apartment. He said that he was present when the knife was found.

The victim testified that she and the Defendant dated in March 2010, that she met him through a mutual friend, that his nickname was "Seven," and that they began living together in April 2010. She said that on June 16, 2010, her two children were ages seven and eight and that they lived in the apartment. She said that before June 16, there was no damage to the bathroom doors. She said that on June 15, 2010, a neighbor brought a rifle to the apartment and exchanged it for some of the Defendant's Xanax. She stated that she told the Defendant he did not need the gun and that the Defendant said the gun belonged to him. She said the Defendant took Xanax and drank alcohol that night.

The victim testified that on June 16, 2010, she woke to the sound of the Defendant's pacing the living room floor and he appeared agitated when she attempted to talk to him. Her children were asleep at the time. She said she went to bed the night before the attack between 9:30 and 11:00 p.m. and denied drinking alcohol that day. She stated that she asked the Defendant what was wrong and that the Defendant hit her with the "butt end" of the rifle without speaking to her. She said she pleaded with him and continued asking what was wrong.

The victim testified that the Defendant wore a pair of jeans and a gray tank top that morning and that the tank top was torn during the fight. She said the Defendant held her while he reached for the side of the couch before striking her with the rifle. She said that after the Defendant struck her twice in the forehead, he said, "[I]f you call the police or . . . tell anybody what I've done, I'm going to kill you and your whole family. And I know where your Momma lives." She said that she "smarted back" and that the Defendant grabbed her by her ponytail and dragged her around the apartment. She said she attempted to call the police from her cell phone when the Defendant was dragging her around the apartment. She said the Defendant grabbed the phone and "split it in half."

The victim testified that the Defendant dragged her into the dining room, kitchen, living room, hallway, and master bedroom. She said that after he dragged her into the master bedroom, the Defendant continued to hit her with the rifle and his hands. She said that the noise woke her children and that her youngest son came to the bedroom door and said, "Seven, please don't hit her again. You're going to kill her and she's all we have. . . ." She said the Defendant stopped hitting her for a few minutes. She said that the Defendant dozed in and out of sleep a few times, that she saw the Defendant's cell phone on the floor, and that she called the police from his phone. She said her children were beside her when she called the police. She said she could not stay on the phone with the 9-1-1 dispatcher because she was locked in the bathroom and heard the Defendant outside the door. She said the Defendant began hitting the door.

The victim testified that the primary damage to the apartment was from the blood on the walls and floor. She stated that blood spatter was in the walk-in closest and the bathroom and that bloody fingerprints were throughout the apartment. She said that when she was inside the walk-in closet, she decided to stop fighting the Defendant. She said that she was lying in the fetal position and covering her head when the Defendant continuously hit her with the rifle. She said she thought she was going to die. She said that at some point she managed to disarm the Defendant, although she did not recall how she did it. She said she pointed the gun at the Defendant and told him that she only wanted to leave with her children. She denied knowing if the rifle was loaded. She stated that when the Defendant walked toward her, she pulled the trigger but that the gun did not fire. She said she threw the gun to the side and attempted to leave with her children. She said she turned her head and was hit on the left side of her head with a metal baseball bat. She said she could not hear out of her left ear, which was purple from the attack. She said that her hearing was severely impaired after the assault and that she still had twenty percent hearing loss.

The victim testified that she attempted to leave with her children about five times by running to the door. She said that each time they tried to leave, the Defendant said, "I hope you can run faster than these two bullets." She identified the knife found inside the

-3-

apartment.  She said the Defendant held the knife to her throat and threatened to cut her if she attempted to leave.  She said the Defendant told her that he loved her and that he did not want her to leave.  She said she put up her hand to move the knife from her neck, but the Defendant moved the knife to her neck.  She identified a scar on her neck from the Defendant's slightly cutting her neck.  She said the wound was not life threatening and was only deep enough to draw a small amount of blood.  She said she was afraid for her life when the Defendant held the knife to her neck.  She agreed the cut to her neck was accidental.

The victim testified that she heard the Defendant snoring in the living room when she and her children were in the back bedroom.  She said they quietly walked down the hallway and into the living room.  She said that she watched the Defendant the entire time and that he woke when she turned the door knob.  She grabbed her children and ran out the door.

The victim testified that when she gave her statement to the police, she was in shock and disbelief over what the Defendant did to her and her children.  She said she told the officer about the gun and the knife but forgot about the bat.  She identified photographs of her injuries and said her entire body was bruised.  The photographs showed multiple bruises and contusions to her legs and knees, which the victim said were caused by the Defendant's dragging her across the carpet.  The photographs showed an injury to her forehead near her hairline, which she said was caused by the Defendant's hitting her with the rifle.  The photographs showed a scratch and a bruise to her cheek, a bite mark on her right thigh, two cuts to the back of her head, and scrapes and "rug burns" to her knees.  She identified injuries to her left eye and left ear and said one of her teeth was pushed back during the attack.  She said that she underwent two root canals and that the bite mark was still visible on her thigh.  She said the bruises in the photographs looked worse two days after the attack.

The victim testified that her neighbor cared for her children while she was hospitalized, that she was evicted, and that she stayed with various family members.  She said the Defendant attempted to contact her within two days of the attack while he was in confinement.  She said that at the time, she used the Defendant's cell phone.  Within two weeks, she spoke to the Defendant four or five times.  She said she received collect calls but did not accept the charges.  She said the Defendant had his mother call her by three-way calling.  She admitted visiting the Defendant in confinement and reconciling with him.

The victim identified a telephone call made by the Defendant on June 25, 2010, which was played for the jury.  She identified the Defendant's voice and another male known as BG.  The Defendant said to the victim, "I just wanna know you know what I'm saying.  Can you just let me loose?"  The victim said, "You beat the f--- out of me and almost kill[ed] me.  You think I'm going to be with you?"  The Defendant told her he loved her, and the victim

said, "You don't love somebody when you about to kill 'em." The Defendant apologized.

The victim identified a second telephone call made by the Defendant on June 30, 2010, which was played for the jury. The Defendant told the victim that his mother renewed the "food stamps" and that he was going to receive a car soon. The victim said she did not need any food but agreed to take the food stamp card.

The victim identified a third telephone call made by the Defendant on July 1, 2010, which was played for the jury. The Defendant and the victim discussed their relationship and their love for one another. The Defendant said, "Them charges gonna get dismissed. That dude said that . . . I'm stupid . . . if I cop . . . to something cuz if you don't come to court they gotta dismiss" the charges. The victim said the only reason she appeared in court previously was to obtain her keys. She said she told the prosecutor that she did not want to testify. The Defendant told her to "put that in . . . the letter too. That you were forced" to testify. The victim testified that she could not recall the number of times the Defendant spoke about her not coming to court and that the letter was to the prosecutor. The Defendant told the victim, "You did what you did. You know you didn't put your hands on me but you did talk back to me and it worked. . . . You put your head down and you did good. I'm proud of you. You did good, you didn't touch me." The victim testified that the Defendant was talking about her not hitting him back during the attack.

The victim identified another telephone call made on July 3, 2010, in which the Defendant told the victim that she could not get into trouble for having a rifle because it was not illegal. He said that the rifle belonged to her and David and that she learned the Defendant could not be around firearms and was going to get rid of it. The victim testified that David was her former boyfriend. The victim expressed concern regarding her being charged with perjury, and the Defendant said she would not be charged with perjury. The victim identified the Defendant's mother's voice, who said that the victim would not be prosecuted for perjury and that the victim needed to tell the police that they loved each other and made a mistake. The Defendant admitted hitting the victim. He said that he had no right putting his hands on her and said,

> I beat you up bad. That's where your bruises, scrapes and all that come from.
> And you just, just need to let them . . . that's what I did. . . . And I shouldn't
> did [sic] that so I wanna do time for that. If they make me do the whole 11/29,
> I will do it. But that other s--- man, don't stress that s--- man. You know what
> I'm saying.

The Defendant told the victim to tell the prosecutor that he was going to obtain psychiatric treatment and that they were both going to seek counseling. The Defendant asked if the victim obtained a restraining order, and the victim denied obtaining one.

The victim testified that she spoke to a defense investigator and that she changed her version of events. She said she told the investigator that she started the fight with the Defendant, that she obtained the gun from a friend, and that the bite mark was inflicted when she held down the Defendant. She agreed she told the investigator that she could not recall much of what happened in June or July 2010 because of her mental illness and medication. She said she told the investigator that the Defendant did not use a weapon against her because the Defendant kept "hammering" her to tell the authorities that he did not use a weapon. She denied being threatened by the police or the prosecutor to testify.

The victim testified that she took medication for epilepsy and paranoid schizophrenia as a result of post-traumatic stress. She denied seeing "a lot of delusions" and said she suffered from bipolar disorder. She denied that her medications impaired her ability to think or perceive reality. She said she suffered from delusions rarely and had to be under a large amount of stress for the delusions to occur. She said her delusions were limited to seeing spiders and hearing someone having a conversation behind her ear.

On cross-examination, the victim testified that a psychiatrist began treating her in April or May 2010 and that she was only taking Saphris for schizophrenia and bipolar disorder on June 16, 2010. She said that although she was acquainted with the man who brought the gun to her apartment the day before the attack, she did not know him well. She said the conversation about trading the rifle for Xanax occurred around 7:00 that night. She said that the man with the rifle came into the apartment, that she asked the Defendant about the gun, that the Defendant said the man wanted to trade the rifle for Xanax, and that she told the Defendant the trade was a bad idea. She denied asking if the rifle was loaded. She said the gun was on the living room table when she went to bed for the night.

The victim testified that she told a defense investigator that the gun was in the house before June 16, 2010, and that she started the fight. She said she and the Defendant reconciled in July and in October 2010. She did not recall writing a letter to the Defendant stating that she should have told the police the truth about the gun. She said that the Defendant wanted her to write a letter to the prosecutor and that he wanted her to send a "test letter."

The victim testified that she and the Defendant did not argue on the evening of June 15, 2010. She said the apartment floors had carpet except for the kitchen and dining room. She said that at 5:00 a.m., she heard the Defendant picking up and placing his beer bottle on

the glass coffee table. She said he appeared intoxicated, did not stumble, and spoke clearly. She did not recall whether the Defendant hit her with his hands or with the rifle first. She denied she was under the effects of her medication when she woke that morning.

The victim testified that the Defendant dragged her through the apartment by one of her legs while hitting her with the rifle. She agreed she did not testify at the preliminary hearing about the Defendant's dragging her and said it was a difficult day. She did not recall whether she told the defense investigator that the Defendant dragged her. She thought she told the hospital staff about the Defendant's dragging her but was not sure. She first refused medical treatment because she was concerned about her children and wanted to go home. She said she told the domestic violence coordinator and the prosecutor who handled the preliminary hearing about the Defendant's dragging her.

The victim testified that the Defendant had sickle cell anemia, that he dozed off during the attack, and that the Defendant was "fully awake" when he grabbed the baseball bat. She said the knife came from a kitchen drawer and denied retrieving it. She said she first saw the knife when she walked down the hallway and attempted to leave the apartment because she thought the Defendant was asleep. She said the Defendant held the knife to her throat for a few seconds. She said that when the Defendant dropped the knife, he sat down on the sofa and told her to go to the bedroom. She said she complied.

The victim testified that she attempted to leave the apartment immediately after the first few blows because the Defendant did not have hold of her. She denied attempting to escape when the Defendant dragged her. She denied the Defendant's aiming the gun at her. She said the Defendant had the gun on his lap the last time she saw it. She said she last saw the baseball bat in the bedroom. She denied knowing where the knife was but said the Defendant held it to her throat in the hallway.

The victim testified that she last called 9-1-1 when the Defendant was in the living room dozing in and out of sleep. She said that when she left the apartment, the Defendant was on the sofa. She agreed that they reconciled in June 2010 and that their relationship ended in February 2011. She said that the Defendant was jealous and that they previously argued over a male friend. She denied having a sexual relationship with this friend in February 2011, although the Defendant thought otherwise. On redirect examination, the victim stated that her children and the Defendant were the only people inside her apartment when she woke on June 16, 2010.

The victim's medical records were received as an exhibit. The victim had facial and scalp swelling, back pain, a post-traumatic headache, a cerebral concussion, contusions to the face and scalp, a chest wall injury, a mild elevated heart rate, a bite laceration to the

thigh, and multiple lacerations to the face and scalp. No fractures were found, but an extracranial soft tissue hematoma and possible laceration to the right side of the head were identified.

Metro Police Officer James McDugle testified that he responded to a domestic disturbance at the victim's apartment, that the Defendant was in custody when he arrived at the scene, and that the victim was in the ambulance. He said he assisted the other officers in looking for evidence. He said he found the knife in the kitchen sink. On cross-examination, Officer McDugle stated that he was instructed to search the apartment for a gun and a knife. He did not recall being told to search for a baseball bat and said he did not find a bat. He did not recall whether the recovered knife was bloody or wet.

Metro Police Crime Scene Investigator Lisa Whitaker testified that she took photographs of the victim at the hospital at 6:05 a.m. She said the victim told her that her boyfriend struck her with a rifle, a bat, and a knife.

Metro Police Officer Thomas E. Simpkins testified that he took photographs of the rifle found at the scene and processed it for fingerprints. He said that he did not find any fingerprints on the rifle, which was common because of the stock and grips's texture. He said that ninety percent of the time he was unable to identify fingerprints on a gun. He denied analyzing the gun for the presence of blood because he was not asked to perform the test. He said it was possible that blood could be on an item, though not visible.

On cross-examination, Officer Simpkins testified that he did not expect to find any fingerprints on the gun. He said that had someone grabbed the metal barrel of the gun, fingerprints might not be found because fingerprints do not stay on hard objects long. He denied knowing what occurred at the scene. He said that he did not see blood on the gun and denied that he was asked to examine the knife and baseball bat for fingerprints. He said he was only asked to process the gun for fingerprints.

Heather Wayman testified that on June 16, 2010, she lived at Rural Hills Apartments with her son and that the Defendant and the victim lived above her apartment. She said that on June 16, she awoke to the sound of someone being beaten and that she heard yelling and screaming coming from the victim and the Defendant's apartment. She said she got out of bed and walked to the living room where the majority of the noise was centered. She said she called 9-1-1 when she heard the victim's children. She said she heard noise coming from the living room, dining room, and bedroom for about ten to fifteen minutes.

Ms. Wayman testified that she heard the Defendant say, "You're not going nowhere." She said the Defendant "told the children to shut up and sit down, get in their rooms." She

said the Defendant told the victim repeatedly that he was going to kill her. She said that the victim tried to leave but that the Defendant would not allow it and took her car keys. She said she heard the Defendant say, "[D]on't open that door again," and "Leave the d--- door alone." She said she heard one of the victim's children say, "[C]ome on, Momma. I can't leave you." She heard the children crying and screaming for their mother.

Ms. Wayman testified that she heard the victim coming down the stairs, that she opened her apartment door, and that she told the victim and the children to come inside. She said the victim was bleeding from her mouth, ear, and head. She said the bruising was worse days after the attack. She said that the victim left her apartment and that an ambulance took her to the hospital. She said she cared for the children while the victim was treated at the hospital. She said that she saw the Defendant when the police took him into custody and that the Defendant did not have any injuries. She did not notice if the Defendant's hands were bloody.

Ms. Wayman testified that after the attack, the victim asked her to search the victim's apartment for the victim's keys but that she did not find them. She said that during her search, she found the Defendant's clothes and a metal baseball bat under the clothes. She said she saw blood in the closet, bathroom, hallway, bedroom, and living room. She said she took the bat to her apartment, kept it there for a few hours, and threw it in the trash. She said she threw it away because she feared the Defendant's coming home and using it again. She said she saw the Defendant use the bat several times.

On cross-examination, Ms. Wayman testified that she heard the yelling for about ten to fifteen minutes before she called 9-1-1. She said the victim came to her apartment after being released from the hospital to get her children. She stated that she entered the victim's apartment around 7:00 or 8:00 a.m. after the attack and that she threw away the bat a few hours later. She said the blood she saw inside the victim's apartment was on the walls and the floor. She said she heard the children yelling from her living room and could not recall where the Defendant was when she heard him talking. She said the majority of what she heard was clear. On redirect examination, Ms. Wayman stated that when she was inside the apartment, she noticed a hole in one of the bathroom doors.

Metro Police Officer Matthew Barnes testified that he saw the Defendant at the scene and did not notice any injuries to him. He said he saw a gun in the living room and blood on the living room floor in front of the couch. He denied searching the apartment for other evidence. On cross-examination, Officer Barnes stated that he did not write a report but that he talked to the officer who wrote an incident report.

Metro Police Officer Marsha Brown testified that she spoke with the victim on June 28, 2010, and that she requested DNA and fingerprint analyses of the gun found at the scene. A recording of her conversation with the victim was played for the jury.

The victim told Officer Brown that she and the Defendant began dating in March and moved into the apartment in April. The victim said that the Defendant hit her with a rifle and a baseball bat and that she did not know why she did not mention the bat at the scene. She said she was distraught and placed in the ambulance quickly. She said the rifle belonged to a friend who came to the apartment the night before the attack, but she also said the Defendant told her the gun was his. She denied that the gun was hers and said that she had not owned a firearm in years. The victim told Officer Brown that she woke to the Defendant's pacing in the living room, that she asked him what was wrong, that he "went crazy," that he dragged her by her hair around the apartment, and that he beat her with the rifle. She said she was able to get the rifle away from the Defendant, but he grabbed the baseball bat. She told Officer Brown that her neighbor took the bat from the apartment after the police left and that the neighbor still had it. She denied that the Defendant's brother stayed at their apartment before the attack, although one of the Defendant's brothers visited the apartment the day before the attack.

On cross-examination, Officer Brown testified that she discussed with Officer Simpkins possible contamination on the rifle because the Defendant and the victim touched it. She stated that the rifle was never tested for DNA and that she did not request testing on the knife. She agreed the victim did not mention a knife during their conversation.

The jury found the Defendant guilty of especially aggravated kidnapping, two counts of aggravated assault, and being a felon in possession of a firearm. The trial court sentenced him to an effective forty-six-year sentence. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his conviction for especially aggravated kidnapping. He argues that the removal or confinement of the victim was essentially incidental to that necessary to accomplish the aggravated assaults. The State does not address sufficiency of the evidence as a separate issue but concedes that the jury was improperly instructed with regard to whether the confinement substantially interfered with the victim's liberty. We conclude that the evidence is sufficient to support the Defendant's conviction for especially aggravated kidnapping.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

Relevant to this case, especially aggravated kidnapping "is false imprisonment . . . [a]ccomplished with a deadly weapon or by display of an article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" T.C.A. § 39-13-305(a)(1) (2010). "A person commits . . . false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a).

In the light most favorable to the State, the victim woke to the Defendant's pacing in the living room, and the Defendant appeared agitated when she attempted to talk to him. The victim asked him what was wrong, and the Defendant hit her with the "butt end" of a rifle without speaking. After striking the victim twice in the forehead, the Defendant threatened to kill her and her family if she attempted to call the police or to tell anyone about the assault. The Defendant grabbed the victim by her ponytail, dragged her around the apartment, and continued hitting her with the rifle. In the master bedroom, the Defendant continued hitting her with the rifle and his hands. The noise woke her two young children. While in the walk-in closet, the victim managed to disarm the Defendant. She pointed the rifle at him and told him she only wanted to take her children and leave. When the Defendant walked toward her, she pulled the trigger, but the rifle did not fire. The victim threw the rifle to the side and attempted to leave, but the Defendant struck her with a metal baseball bat. She attempted to leave the apartment multiple times by running with her children to the front door, but each time they tried to leave, the Defendant said, "I hope you can run faster than these two bullets." The Defendant's hitting her with the bat to prevent her leaving demonstrates the element of false imprisonment by unlawful removal or confinement as necessary for a kidnapping offense.

Regarding the element of use of a deadly weapon or an article used or fashioned to lead the victim to believe it was a deadly weapon, the evidence demonstrates that during the attack, the Defendant had a rifle, a knife, and a baseball bat. The victim testified about the extent of her injuries, which were verified by photographs taken at the hospital and medical records. The victim thought she was going to die. The Defendant threatened to kill her and her family if she attempted to call the police or to tell anyone about his assaulting her. The elements of especially aggravated kidnapping are satisfied apart from the aggravated assault.

## II

The Defendant contends that the trial court improperly instructed the jury regarding whether the removal or confinement substantially interfered with the victim's liberty. He argues that the improper jury instruction is reversible error. The State concedes that the jury was instructed improperly and that the Defendant is entitled to a new trial. We conclude that the court failed to instruct the jury properly but that the error was harmless beyond a reasonable doubt. The Defendant is not entitled to relief.

Our supreme court recently overruled the existing case law providing the due process analysis to be applied upon appellate review of dual convictions of kidnapping and an accompanying felony. *See State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012) (*overruling State v. Richardson*, 251 S.W.3d 438 (Tenn. 2008); *State v. Fuller*, 172 S.W.3d. 533 (Tenn. 2005); *State v. Cozart*, 54 S.W.3d 242 (Tenn. 2001); *State v. Dixon*, 957 S.W.2d 532 (Tenn. 1997); *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991)). Previously, an appellate court was required to conduct a due process inquiry in order to determine whether dual convictions were constitutionally permissible. *See, e.g., Richardson*, 251 S.W.3d 438.

In *Anthony*, our supreme court focused on whether due process permitted dual convictions for kidnapping and accompanying felonies such as robbery and rape because these accompanying offenses inherently involve some level of detention and confinement. *Anthony*, 817 S.W.2d at 303. The court noted that assault might be an accompanying felony because detention and confinement against a victim's will might be included in the offense. *Id.* The court concluded that the due process analysis was "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself to warrant independent prosecution, and is, therefore, sufficient to support such a conviction." *Id.* at 306. The court explained that the test was whether the kidnapping was "essentially incidental" to the accompanying offense. *Id.* at 307.

In *White*, our supreme court said that the separate appellate due process analysis in *Anthony* and its progeny was no longer necessary. *White* held that the inquiry "is a question for the jury after the appropriate instructions," with appellate review of the sufficiency of the evidence serving as the due process protection. *Id.* at 577-78. In *White*, the court concluded that "the legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony." *White*, 362 S.W.3d at 562. "[T]rial courts must ensure that juries return kidnapping convictions in those cases in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." *Id.* at 578. In order to perform this function, the court detailed a jury instruction that must be provided to juries to ensure that a defendant's

due process rights are protected. The instruction ensures that a jury finds beyond a reasonable doubt that the confinement or removal is significant enough, standing alone, to support a kidnapping conviction or that the confinement was incidental to the accompanying felony. *Id.* Although *White* overruled *Anthony* and its progeny, the extent of *White*'s application is unknown because the offenses discussed in *White*, rape and robbery, inherently involve some form of confinement. Likewise, although the court highlighted the accompanying felonies of rape and robbery, it did not suggest that the *White* instruction was inapplicable to other felonies. *White* implied, though, that if the accompanying felony does not necessarily involve some form of confinement, the *White* instruction is unnecessary.

The supreme court provided a jury instruction regarding the "substantial interference" element of kidnapping:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> • the nature and duration of the victim's removal or confinement by the defendant;
>
> • whether the removal or confinement occurred during the commission of the separate offense;
>
> • whether the interference with the victim's liberty was inherent in the nature of the separate offense;
>
> • whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;
>
> • whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and
>
> • whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

-13-

*Id.* at 580-81 ("We invite the Tennessee Pattern Jury Instruction Committee to promulgate a pattern jury instruction for those trials in which a defendant is indicted for kidnapping and an accompanying felony. Until the development of an appropriate instruction, however, the language articulated herein shall apply.") (footnotes omitted).

Under *White*, an instruction is required if the proof "fairly raised" a question of whether there was a kidnapping offense separate from the accompanying felony. *See State v. Bennie Osby*, No. W2012-00408-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App. Nov. 2, 2012). In this pre-*White* case, the jury was not so instructed. We must consider whether the question of a separate offense was fairly raised by the proof such that the instruction was required.

In the light most favorable to the Defendant, the record shows that the Defendant struck the victim in the head multiple times with a rifle, dragged her around the apartment, and threatened to kill her and her family if she attempted to call the police or tell anyone about the assault. Once in the master bedroom, the Defendant continued striking the victim in the head with the rifle while she lay defenseless on the closet floor. The victim disarmed the Defendant and pointed the rifle at him. She told the Defendant she only wanted to take her children and leave. When she turned to leave with her children, the Defendant struck her in the head with a metal baseball bat. The victim and her children attempted to leave several times by running to the front door, but each time they ran, the Defendant threatened to kill her. The victim thought she was going to die.

We conclude that the assault involved some degree of confinement, although the dissent concludes otherwise. The victim was beaten with the rifle and baseball bat, which prevented her from leaving the apartment with her children or summoning assistance. Likewise, we conclude that the Defendant's actions raise the issue of whether the kidnapping was incidental to the aggravated assault. The Defendant's striking the victim with the rifle and the baseball bat also reduced the Defendant's risk of detection. Because we conclude that some level of interference with the victim's liberty was inherent in the assault, the issue of a separate kidnapping offense was fairly raised by the proof.

Because the proof fairly raised the question of whether a kidnapping offense occurred separately from the aggravated assault, we conclude that the *White* jury instruction should have been given. *See Bennie Osby*, slip op. at 8. The question is, then, whether the error was harmless beyond a reasonable doubt. *See White*, 362 S.W.3d at 580 n.20; *Bennie Osby*, slip op. at 9. In determining whether the error is harmless beyond a reasonable doubt, this court must evaluate "the harmful effect of the trial court's failure to instruct the jury that the 'key element - the substantial interference with the victim's liberty - [requires] a finding by the jury that the victim's removal or confinement was not essentially incidental to the

accompanying felony offense.'" *Bennie Osby*, slip op. at 12 (quoting *White*, 362 S.W.3d at 580). The critical question is whether an appellate court could "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the instructional error." *White*, 362 S.W.3d at 580.

We conclude that the trial court's failure to provide the *White* instruction was harmless beyond a reasonable doubt. The proof overwhelmingly established that the victim's confinement went beyond that necessary to accomplish the aggravated assault. As previously noted, the Defendant struck the victim with the butt of the rifle without warning or provocation. He dragged her around the apartment by her hair and into the master bedroom where he continued to strike her with the butt of the rifle as she lay defenseless on the closet floor. While in the closet, the victim managed to disarm the Defendant. She pointed the rifle at him and told him she only wanted to take her children and leave. When the Defendant walked toward her, she pulled the trigger, but the rifle did not fire. The victim threw the gun to the side and attempted to leave, but the Defendant struck her with a metal baseball bat. Later, she attempted to leave the apartment multiple times by running with her children from the master bedroom to the front door, but each time they tried to leave, the Defendant threatened her life. During one of her attempts to leave, the Defendant held a knife to the victim's throat, cut her, and threatened to kill her if she left.

The Defendant also contends that the trial court erred by instructing the jury that "the offense of especially aggravated kidnapping does not require a finding that Defendant moved the victim any specific distance or confined her in any particular place or restrained her for any particular length of time in order for the Defendant's actions to substantially interfere with her liberty." He argues that the instruction is an improper judicial comment on the evidence and unduly focuses on certain aspects of the proof. The State does not address this issue independently. We conclude the Defendant is not entitled to relief.

Our supreme court has concluded that judges may not make statements that might reflect upon the weight of the evidence, the credibility of witnesses, or otherwise influence the jury's verdict with regard to the facts. *State v. Suttles*, 767 S.W.2d 403, 406-07 (Tenn. 1989). Although the Defendant argues the instruction was an improper statement of the trial court's opinion that the State satisfied the elements of false imprisonment, we disagree. The instruction was a correct statement of the law and did not improperly comment on the weight of the evidence. *See State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992) (citing *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975)).

## III

The Defendant contends that the trial court erred by failing to merge the aggravated assault convictions. He argues that the separate convictions violate double jeopardy principles because the evidence only supported one criminal episode with one criminal intent. The State responds that the trial court did not err because the Defendant used two separate weapons during intermittent assaultive acts that occurred over a period of time. We agree with the State.

The federal and Tennessee constitutions protect against multiple punishments for the same offense. *State v. Watkins*, 362 S.W.3d 530, 548 (Tenn. 2012) (citing *State v. Denton*, 938 S.W.2d 373, 381 (Tenn. 1996)). "In single prosecutions, multiple punishment claims ordinarily fall into one of two categories, . . . referred to as 'unit-of-prosecution' and 'multiple description' claims." *Id*. at 543. Unit of prosecution claims arise "when defendants who have been convicted of multiple violations of the same statute assert that the multiple convictions are for the 'same offense.'" *Id.* For these claims, courts determine whether a single offense is involved not by applying the *Blockburger* test, but by determining "what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment." *Id.* (quoting George C. Thomas, *A Unified Theory of Multiple Punishment*, 47 U. Pitt. L. Rev. 1, 11 (1985)). Our supreme court has stated that courts are to "apply the 'rule of lenity' when resolving unit-of-prosecution claims, meaning that any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to authorized multiple units of prosecution." *Id.* (citing *Gore v. United States*, 357 U.S. 386, 391-92 (1958)).

The Defendant was convicted of aggravated assault in counts two and three of the indictment by using and displaying a deadly weapon. *See* T.C.A. § 39-13-102(a)(1)(A)(ii) (2010). In count two, the deadly weapon was the rifle. In count three, the deadly weapon was the knife. The evidence shows that the attack spanned at least ten to fifteen minutes. With regard to count two, the Defendant struck the victim in the face with the butt of a rifle and dragged her around the apartment and into the master bedroom. There, the Defendant continued hitting her with the rifle while she lay on the closet floor. She feared for her life while the Defendant struck her with the rifle. At some point during this assault, the victim managed to disarm the Defendant of the rifle, point it at him, and request that she be able to leave with her children. As she attempted to leave, the Defendant struck her in the head with a metal baseball bat.

With regard to count three, the Defendant grabbed the victim, held a knife to her throat, threatened to kill her if she attempted to leave the apartment, and told her that he loved her and did not want her to leave. She feared for her life. Although the wound to her

neck was not life threatening, the cut left a scar. The victim testified that she first saw the knife when she walked down the hallway and attempted to leave the apartment and that he held the knife to her throat while she was in the hallway. She said she attempted to leave because she thought the Defendant was asleep.

The Defendant primarily relies on *State v. Pelayo*, 881 S.W.2d 7 (Tenn. Crim. App. 1994), to support his contention that his aggravated assault convictions should have been merged. We distinguish the case. In *Pelayo*, the Defendant was convicted of two counts of aggravated assault, but this court concluded that only one continuous assault occurred. There, the defendant became angry at the victim, left the home, and retrieved a knife. When he returned with the knife, the victim told her son to leave and find help. As the son left to find help, the defendant cut the victim on the arm. The defendant also cut the victim on the side of the head when she and her daughter attempted to escape. The victim escaped, and the defendant gave chase. While outside the home, the defendant stabbed the victim in the leg. In contrast to the present case, the defendant in *Pelayo* was charged under the serious bodily injury provision for the injury to the victim's arm and charged under the deadly weapon provision for the leg injury. This court concluded that the victim's attempting to escape did not divide the assault into multiple offenses and that had she not attempted to escape, the wounds would have been inflicted simultaneously. The court concluded that although the assaults were separated by a few seconds and mere feet, the assaults "coalesced into an 'unmistakable single act.'" *Id.* at 13.

In the present case, the first assault ended with the victim's taking the rifle from the Defendant and the Defendant's striking the victim in the head with a metal baseball bat. The record shows that after the first assault, the victim and her children stayed in the master bedroom and that the Defendant went into the living room. There, the Defendant began to doze. It was not until the victim attempted to leave the apartment after watching the Defendant doze that he cut the victim's throat with a knife. Although the victim might not have recalled the events with perfect memory, the evidence shows the Defendant's hitting the victim with the rifle occurred first and ended when the Defendant struck her with the bat as she turned to leave. It was not until later that she attempted to leave the apartment again. The episode with the knife occurred in the hallway during one of her later attempts to leave the apartment. We conclude that the attack was not continuous, that the aggravated assaults were separate and distinct offenses, and that the convictions do not violate double jeopardy principles. The trial court did not err by not merging the aggravated assault convictions.

**IV**

The Defendant contends that the trial court imposed excessive sentences for the especially aggravated kidnapping and aggravated assault convictions. He argues that the trial

court erroneously applied three enhancement factors. The State responds that the trial court properly sentenced the Defendant. Although the trial court improperly applied two enhancement factors, we conclude that the sentence is reasonable under the existing circumstances.

At the sentencing hearing, the presentence report was received as an exhibit. According the report, the Defendant had previous convictions for domestic assault, harassment, reckless endangerment involving a deadly weapon, attempted second degree murder, and voluntary manslaughter. The judgments showed that the Defendant was on parole for voluntary manslaughter when he committed the attempted second degree murder. A certified copy of a general sessions disposition sheet showed the domestic assault conviction was related to an assault of the same victim. The Defendant was on probation for this offense when he committed the instant offenses. The presentence report showed the Defendant reported completing the eighth grade and suffering from anxiety and depression. The report showed the Defendant's mental health was fair and his physical health was poor. The Defendant stated he was disabled due to heart problems and sickle cell anemia.

The victim testified that she prepared a written statement for the court, which was received as an exhibit. The victim said that June 16, 2010, was the worst day of her life. She said she still had scars from the attack but did not know if she would ever heal emotionally. She said the attack made it difficult for her to trust males. She said her two children witnessed the attack but were "willing and ready to love." She said that her younger son was protective of her and did not want men around and that her older son trembled at any hostility. She stated that she knew the Defendant was under the influence of alcohol and narcotics at the time of the attack, that she knew there was good in him, and that she wanted him to receive help. She said that the Defendant destroyed her life, that she had nightmares about the attack, and that she now suffered from panic attacks. She said parenting and interacting with her children was difficult. She wanted the Defendant to be punished for his actions.

Lydia McCray, the Defendant's mother, testified that the Defendant's sister, uncle, former girlfriend, and daughter were present at the hearing. She said the Defendant was a nice person but was raised in an abusive home and witnessed her suffering abuse. She said the Defendant had experienced a lot of pain and misery throughout his life. She said that she felt guilty because she spent a lot of time keeping the Defendant alive and may not have "done some of the things" she needed. She said she was absent from his life for a period of time.

Ms. McCray testified that she believed the Defendant changed because he had God in his life. She said she believed the Defendant had overcome most of his problems, though

he still had much to learn. She said he was diagnosed with sickle cell anemia when he was one year old and that he received disability benefits as a result. She said the Defendant's father died four or five years previously. She said she was absent from the Defendant's life because she ran from the Defendant's father, who threatened and attempted to kill her and her children.

Malana Ann Sanderson, the Defendant's former girlfriend, testified she dated the Defendant for about one year and that she met him when she was incarcerated. She said the Defendant stayed with her mother and cared for Ms. Sanderson's youngest child. She said the Defendant was a good person. She said that they began dating after she was released from confinement, that they discussed marriage, and that the Defendant wanted to adopt her daughter. She said that they argued like normal couples but that their arguments never became physical. She denied either of them used drugs during their relationship.

Ms. Sanderson testified that her relationship with the Defendant ended when she violated her probation and was sentenced to confinement. She said she did not speak to the Defendant until after the Defendant was arrested. She said that she began answering telephone calls from him and writing to him and that she wanted to rebuild their friendship.

On cross-examination, Ms. Sanderson testified that she did not know how the Defendant met her mother or came to live with her. She denied she told someone in the district attorney's office that the Defendant put a gun into her mouth. She did not recall the incident and denied talking to anyone in the district attorney's office.

The trial court found that the Defendant committed a heinous offense, treated the victim with extreme cruelty, and had no regard for the victim's life. The court found that the Defendant hit the victim with the butt end of a rifle and an aluminum baseball bat. The court found that although the assault did not last long, the attack was brutal. The court found that enhancement factors (1), (5), (6), (9), and (10) applied. *See* T.C.A. §§ 40-35-114(1) (2010) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"); -114(5) ("The defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense"), -114(6) ("The personal injuries inflicted upon . . . the victim was particularly great");-114(9) ("The defendant possessed or employed a firearm . . . or other deadly weapon during the commission of the offense"), -114(10) ("The defendant had no hesitation about committing a crime when the risk to human life was high"). The court sentenced the Defendant as a Rage II offender to thirty years for especially aggravated kidnapping, eight years for each aggravated assault, and three years for being a felon in possession of a firearm. The court ordered consecutive sentencing with regard to the especially aggravated kidnapping and aggravated assault convictions for an effective forty-six-year sentence.

Previously, this court's review of the length of a sentence was de novo with a presumption of correctness. T.C.A. §§ 40-35-401(d), -402(d) (2010). Recently, though, the Tennessee Supreme Court adopted a new standard of review for sentencing in *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Currently, a sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708.

In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; *see State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986).

Challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. *Bise*, 380 S.W.3d 68 at 706. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id.*

The Defendant contends that the trial court misapplied enhancement factor (5) regarding exceptional cruelty. The application of enhancement factor (5) requires a finding that the victim was treated with cruelty over and above that "inherently attendant to the offense." *State v. Leggs*, 955 S.W.2d 845, 849 (Tenn. Crim. App. 1997), *abrogated on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000). Simply because serious bodily injury is an element of aggravated assault, the application of factor (5) is not automatically precluded. *Id.* The use of exceptional cruelty may, where appropriate, be considered as an enhancement factor in the assault of a victim. *See State v. Gray*, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997). The Defendant struck the victim in the head with the butt of a rifle without warning and provocation, dragged her throughout the apartment by her hair, continuously struck her in the head with the gun while she lay defenseless on the closet floor, struck her in the head with a baseball bat when she attempted to leave the apartment, and held a knife to her neck threatening to kill her if she left. The Defendant hit the victim with

the gun and the bat in the presence of her two young children, and she thought she was going to die. The victim suffered significant hearing loss that persisted at the time of the trial, underwent extensive dental work, and suffered permanent scars. We conclude that the trial court did not err by applying the exceptional cruelty factor. The ten to fifteen minute attack was brutal, and the injuries inflicted were great.

The Defendant contends that the trial court misapplied enhancement factor (9) regarding employing a deadly weapon during the commission of the offense. He argues that the State was required to establish that the Defendant used a deadly weapon to obtain a conviction for especially aggravated kidnapping and assault. Regarding the especially aggravated kidnapping and the aggravated assault convictions, the jury found beyond a reasonable doubt that the Defendant used or displayed deadly weapons, a rifle and a knife, in the commission of these offenses. The indictment includes the use of a deadly weapon as an essential element of each offense. As the State concedes, the court should not have applied factor (9) because an enhancement factor may not be an essential element of the offense as charged in the indictment. *See State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997); *State v. Nix*, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995).

The Defendant contends that the trial court misapplied enhancement factor (10) regarding a lack of hesitation about committing a crime when the risk to human life was high. He argues that factor (10) is inherent in especially aggravated kidnapping and aggravated assault and that the court was precluded from applying this factor. This court has previously concluded that enhancement factor (10) is inherent in the offense of aggravated assault and cannot be used to enhance a sentence for that offense. *State v. Hill*, 885 S.W.2d 357, 363 (Tenn. Crim. App. 1994). This court has also concluded that enhancement factor (10) is inherent in the offense of especially aggravated kidnapping. *State v. Timmy L. Laster*, No. 03C01-9507-CR-00194, slip op. at 4 (Tenn. Crim. App. July 9, 1996); *State v. Ronald Collier*, No. 02C01-9402-CC-00029, slip op. at 5-6 (Tenn. Crim. App. Oct. 5, 1994). The application of factor (10) was error.

Although we have concluded that the trial court misapplied two enhancement factors, we cannot conclude that the trial court abused its discretion. In addition to enhancement factor (5), the court found that the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. *See* T.C.A. § 40-35-114(1) (2010). The Defendant had previous convictions for harassment and domestic assault against the same victim. The court also found that the personal injuries inflicted upon the victim were particularly great. *See* T.C.A. § 40-35-114(6). The victim suffered multiple bruises, contusions, and lacerations, a bite mark to her thigh, extensive damage to her ear, and damage to her mouth resulting in needed dental work. The sentences are within their respective ranges, and the court followed the statutory sentencing procedure

and made findings of fact supported in the record. Although the court misapplied two enhancement factors, sufficient evidence exists supporting the Defendant's sentences.

The Defendant also contends that the trial court erred by imposing partially consecutive sentences. He argues that the court failed to comply with *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995). The trial court found that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and that he had no hesitation about committing an offense when the risk to human life was high. *See* T.C.A. § 40-35-115(b)(4). The court noted that the Defendant was previously convicted of killing one person and attempting to kill another and found that the present offenses were committed while the Defendant was on probation for domestic assault. The court ordered that the convictions for especially aggravated kidnapping and assault be served consecutively and that the conviction for possession of a firearm as a convicted felon be served concurrently. The court found that consecutive sentencing was necessary to protect the public against further criminal conduct by the Defendant, that consecutive sentences reasonably related to the seriousness of the offenses committed, and that the Defendant had an extensive criminal history.

The determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. *State v. Blouvet*, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b) (2010), which states in pertinent part that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; [or]
>
> (6) The Defendant is sentenced for an offense committed while on probation[.]

"These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing." *State v. Mickens*, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003). Our supreme court, though, concluded that when the imposition of consecutive sentences is based on the trial court's finding the defendant to be a dangerous offender, the court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences

must reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939; *see State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

We conclude that the trial court properly ordered consecutive sentences. The court found that the Defendant was a dangerous offender whose behavior indicated little or no regard to human life and that the Defendant had no hesitation about committing an offense when the risk to human life was high. Although the court complied with the *Wilkerson* requirements, it also found that the Defendant had an extensive criminal history, including previous convictions for attempted second degree murder, voluntary manslaughter, reckless endangerment, harassment, and domestic assault. Likewise, the Defendant was on probation for domestic assault at the time he committed the instant offenses.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE